PEOPLE v BLOYD

Docket No. 64883. Argued January 8, 1981 (Calendar No. 13).—Decided December 23, 1982.

Omer Bloyd was stopped by police officers, questioned, and transported in a police car from one place to another in an attempt to determine whether a crime had been committed. He was eventually charged with breaking and entering with intent to commit larceny. The Wayne Circuit Court, George T. Martin, J., denied the defendant's motion to suppress evidence seized by the police and to quash the information. The Court of Appeals, M. J. Kelly, P.J., and Bronson and D. C. Riley, JJ., reversed (Docket No. 43903). The people appeal.

The Supreme Court *held:*

Under the facts of the case, a person may not be seized, detained, and questioned, and then transported in a police car from one place to another by police officers for the purpose of investigation in the absence of probable cause to arrest; the character of the intrusion upon the defendant's personal security violated his right to be secure against an unreasonable seizure.

Chief Justice Fitzgerald and Justices Kavanagh and Levin adopted as their own an opinion written by the late Justice Moody:

1. Although the initial stop of the defendant's automobile and the questioning and observations which followed immediately at the scene were constitutionally permissible, the purpose of the seizure and detention of the defendant was to allow the police officers to engage in custodial interrogation. The officers had no knowledge that any crime had been committed, only an assumed reasonable suspicion. Under the circumstances, the detention was indistinguishable from a traditional arrest. An official seizure of a person must be supported by probable cause even if no formal arrest is made. The defendant was transported from one place to another in search of a crime, detained for custodial interrogation, and subjected to more than a brief

REFERENCE FOR POINTS IN HEADNOTES
[1, 2] 68 Am Jur 2d, Searches and Seizures § 41 *et seq.*

stop for questioning and investigation at the scene without probable cause to arrest.

2. Where a seizure which otherwise would require probable cause is only a limited intrusion on the personal security of a person and is justified by substantial law enforcement interests, it may be made on less than probable cause, so long as the police have an articulable basis for suspecting criminal activity. Such a seizure and detention may involve interrogation, viewing of the suspect by witnesses to the crime, and, it has been suggested, transportation for such viewing. In this case, there was no report of a crime in the area where the seizure occurred, and the defendant was not transported for the purpose of identification by witnesses. The officers were in full control of the defendant's movement when he was stopped. He was clearly identified, and his address was known. The investigation of businesses in the area to determine if a crime had been committed was not aided or hindered by the presence of the defendant.

3. Because the detention and transportation of the defendant were improper, the seizure of items from his car without a warrant was not justified.

Justice Williams, joined by Justices Coleman and Ryan, concurred on the basis that it was assumed that the original action was without probable cause.

Affirmed.

96 Mich App 264; 292 NW2d 546 (1980) affirmed.

1. SEARCHES AND SEIZURES — WITHOUT A WARRANT — PROBABLE
     CAUSE — LIMITED INTRUSIONS.

A seizure and detention of a person may be made on less than probable cause where the seizure is justified by substantial law enforcement interests, there is only a limited intrusion on the personal security of the person, and the police have an articulable basis for suspecting criminal activity.

2. SEARCHES AND SEIZURES — WITHOUT A WARRANT — PROBABLE
     CAUSE — ARREST.

A seizure, detention, and transportation of a suspect by the police after a permissible stop, for the purpose of allowing custodial interrogation and a search for a crime and not for identification by witnesses, where the police had no knowledge that any crime had been committed, was such a significant intrusion on the personal security of the person detained as to be indistinguishable from a traditional arrest, and required support by probable cause.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Deputy Chief, Civil and Appeals, and *Timothy A. Baughman,* Assistant Prosecuting Attorney, for the people.

*Brook McCray Smith, P.C.,* for the defendant.

FITZGERALD, C.J., KAVANAGH, J., and LEVIN, J. This opinion was written by Justice BLAIR MOODY, JR., prior to his death on November 26, 1982. We concur in this opinion and adopt it as our own.

We are faced with the seizure, detention, and transportation of a person in a police car at a time when the officers were without probable cause to believe that a crime had been committed and without probable cause to believe that the person had committed a crime.

We hold that under the facts of this case, a person may not be seized, detained, and questioned, and then transported in a police car from one place to another in the absence of probable cause to arrest. US Const, Am IV; Const 1963, art 1, § 11. Furthermore, after examining and balancing the character of the intrusion on the personal security of the person detained with the law enforcement interest allegedly justifying such an intrusion, we hold that the detention in this case violated the defendant's constitutional right to be secure against an unreasonable seizure of his person. US Const, Am IV; Const 1963, art 1, § 11.

I

On August 6, 1978, at approximately 4:50 a.m., an Inkster police officer on routine patrol observed the defendant pull out of the supply yard of the

Ernst Fuel and Supply Company. According to the officer, the company was closed at that time.

The officer, who was alone, called a second officer on the radio when he first observed the defendant. The officer's suspicions were aroused, and he stopped defendant's car to investigate what the driver was doing on the company's property at that time. There is no indication in the record that the defendant had committed a traffic offense, that the property was posted against trespassing, that the property was enclosed by a fence, or that there had been any reports of criminal activity in the area.

When the defendant stopped his car, he jumped out and ran back to the officer's patrol car. He presented the officer with his wallet when asked for his license. The officer checked his license and asked him to have a seat in defendant's automobile. The officer requested this action because it had "been my experience when people jump out of the car and run back to meet you, especially late at night, there is something they don't want you to see in their car".

Defendant was asked what he was doing and where he was coming from. He responded that he was changing a tire on the company's property. The officer checked the tires and noted that they were all uniformly covered with dust and dirt and that none of them appeared to have been changed. The officer noted that the defendant was extremely nervous and perspiring. At this time the officer looked into defendant's car and observed a pair of white cotton gloves, a flashlight, and a screwdriver in the front area of the automobile, and a pry bar and three somewhat transparent plastic bags con-

taining magazines and boxes of "x-rated movies" on the rear seat.

A second officer arrived at the scene in response to the radio call. Defendant was advised of his constitutional rights.[1] After defendant indicated that he understood these rights, he was asked where all the movies came from. He declined to give a substantive answer. The defendant was then placed in the back of the first officer's patrol car. The bags of magazines and books, along with the other items, were also placed in the police car. The defendant's car was locked and left where it had been stopped.

The defendant[2] was taken in the patrol car to a business establishment that sells "x-rated books", the Book Shack, to see "if that place had been broken into". On the way to the Book Shack the officer asked the police dispatcher "to call ADT and see how the alarm was" at the Book Shack. The defendant was detained three or four minutes in the patrol car at the Book Shack while the building was checked to see if there were signs of a break-in. There had been no break-in.

Defendant was then driven to the Melody Theatre. The testifying officer stated that theater showed exclusively "x-rated films". It was testified that the theater is located on the same side of the street as Ernst Fuel and Supply and there were no

[1] Defendant was given the warnings required by *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

[2] The record does not indicate if the two police officers were in the same car with the defendant or if each officer drove his own patrol car to the various stops. The second officer did not testify at the preliminary examination. There was no testimony taken from any witnesses at the hearing on the motion to suppress. Cf. *People v Talley*, 410 Mich 378; 301 NW2d 809 (1981) (need for an evidentiary hearing on a motion to suppress).

other businesses between these two places. Initially, the officers did not find any evidence of a break-in at the theater. The defendant was questioned "if he could help us out and tell us where he broke in". The defendant refused.

The officers continued to investigate and discovered that two outside doors had been removed from their hinges. The two officers entered the building and found a display case to be almost empty. The dispatcher was asked to call the manager who arrived at the theater and confirmed that property was missing.

The defendant was advised that he was under arrest for breaking and entering and driven to the police station. He was charged with breaking and entering. MCL .750.110; MSA 28.305. At the preliminary examination, the defendant argued that the arrest and seizure of property were improper. Defendant was bound over for trial in Wayne Circuit Court. His motion to suppress evidence and to quash the information asserted that he was illegally stopped and that evidence was illegally seized. His challenges were based on the Fourth and Fourteenth Amendments to the United States Constitution[3] as well as the Michigan Constitution, art 1, § 11.[4] The motion was denied.

---

[3] The Fourth Amendment, applicable to the states through the Fourteenth Amendment, *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[4] Const 1963, art 1, § 11 provides in relevant part:

"The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation."

The Court of Appeals granted defendant's application for leave to appeal. That Court reversed the denial of his motion. *People v Bloyd,* 96 Mich App 264; 292 NW2d 546 (1980).

The Court of Appeals held that the initial stop of the defendant's automobile for questioning was proper. However, it held that the evidence was improperly seized, because there was no probable cause to seize the evidence. Nor was the evidence seized incident to a lawful arrest since the defendant had been improperly arrested, *i.e.,* without probable cause at the time of the seizure, and the items seized as a result of the illegal arrest must be excluded. "At the time of defendant's arrest, there was no probable cause to link either defendant or the seized items to any particular crime." 96 Mich App 269.

This Court granted the prosecutor's application for leave to appeal which argued that detaining the defendant during the investigation by the officers was proper. 409 Mich 897 (1980).[5]

## II

The principal issue before the Court is the permissible scope of a detention based on less than probable cause. The detention in the police car, argues plaintiff, was within the scope of an investigative stop under *Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968), and even if the detention falls outside of the scope of *Terry,* a

[5] "The parties are directed to include among the issues to be briefed whether under the circumstances of this case the police officer's conduct of stopping the defendant, seizing evidence, and detaining the defendant while he investigated two nearby businesses for evidence of a burglary was unconstitutional."

standard of reasonableness, less than probable cause, is the proper test.

We assume for the purposes of decision of this appeal that the initial stop of defendant's automobile and the on-the-scene questioning and observations which immediately followed the *Terry* stop were constitutionally permissible. The subsequent detention, seizure, and transportation of defendant is in issue.

We also note that the prosecutor does not contend that the defendant was not seized. Thus, the detention involved must comply with the constitutional protection from unreasonable seizures. It is also significant that the prosecutor does not assert that the officers had probable cause to seize or arrest the defendant or that the officers had probable cause to seize the items in the defendant's car prior to the discovery of the break-in at the Melody Theatre. The prosecutor argues that the detention of the defendant beyond the initial stop for questioning need not be based on probable cause, but on a standard of reasonableness.

Our analysis of the instant case involves an assessment of two recent United States Supreme Court cases and an application to the instant facts of the constitutional principles analyzed in those cases.[6] In *Dunaway v New York,* 442 US 200; 99 S Ct 2248; 60 L Ed 2d 824 (1979), the Court held that a detention for custodial interrogation, a procedure that was indistinguishable from a traditional arrest, must be supported by probable cause. And in *Michigan v Summers,* 452 US 692; 101 S Ct

[6] Our conclusions are based on our interpretations of both the federal and state constitutional provisions at issue here. In analyzing the state constitutional question we have looked to federal case authority. *People v Secrest,* 413 Mich 521, 525; 321 NW2d 368 (1982).

2587; 69 L Ed 2d 340 (1981), a search warrant for narcotics was found to implicitly carry with it the authority to detain occupants of a dwelling, including requiring them to return to the premises if found leaving the dwelling, while the search pursuant to the warrant is conducted.

## *Dunaway*

The Rochester, New York, police seized Mr. Dunaway, drove him to police headquarters in a police car and placed him in an interrogation room. He was questioned by officers and ultimately made statements after waiving his right to counsel. After reviewing *Terry v Ohio, supra,* and its progeny, the Court concluded that the detention could not be constitutionally permitted on the basis of a standard of "reasonable suspicion", nor would the Court adopt a multifactor balancing test which weighed the reasonableness of the particular law enforcement conduct for all cases involving seizures which are not technical arrests.

Of primary importance to the *Dunaway* decision was the purpose of the detention—custodial interrogation. Although the questioning, which occurred in custody, happened prior to the development of probable cause, there can be no doubt that the investigation had reached the accusatory stage and focused upon Mr. Dunaway.[7]

It is conceded by the prosecutor in the instant case that the defendant was seized. He was not free to leave and was transported to two different

---

[7] Compare *People v Ridley,* 396 Mich 603; 242 NW2d 402 (1976) (general on-the-scene questioning did not focus upon defendant) and *Miranda v Arizona, supra,* pp 477-478 (general on-the-scene questioning exception to *Miranda*'s requirements) with *People v Reed,* 393 Mich 342; 224 NW2d 867, *cert den* 422 US 1044 (1975).

places, albeit one was very near. Furthermore, the defendant was subjected to "custodial interrogation" as that term was used in *Dunaway.*

In both *Dunaway* and the instant case, the defendant was not questioned briefly where he was found. In *Dunaway,* the defendant was taken in a police car to the police station where he was questioned after receiving *Miranda* warnings. In the case at bar, the defendant was seized, given *Miranda* warnings, questioned, placed in the police car, and driven to two locations and questioned again while in the police car. Although questioning in a police car away from the scene of the initial stop may not be as "coercive" as questioning in a stationhouse interrogation room, the concerns about the coercive atmosphere and interrogation techniques which prompted the *Miranda* decision require the conclusion that the investigation and questioning occurred while defendant was in custody—deprived of freedom of action in a "significant way".[8] Accord, *People v Gilbert,* 21 Mich App 442; 175 NW2d 547 (1970). See Anno: *Custodial Interrogation—Miranda Rule,* 31 ALR3d 565, § 14.

As the facts indicate, a purpose of defendant's seizure and detention was to engage in custodial interrogation. Defendant was asked questions on two occasions after he declined to speak to the officers. Furthermore, although the questioning played a smaller part in the instant investigation than in *Dunaway,* there was an important fact present in *Dunaway* but not here. It was clear that a crime had been committed in the *Dunaway* case. In the instant case, the officers had no knowledge

---

[8] *Miranda v Arizona, supra,* p 477.

of any crime, only an assumed "reasonable suspicion" during the time of detention at issue. The law enforcement interest in solving a brutal slaying is not present in the instant case. *Cf. Dunaway.* Under the circumstances of the instant case, the detention was "in important respects indistinguishable from a traditional arrest". *Dunaway,* p 212. *Cf. United States v Chamberlin,* 644 F2d 1262, 1267 (CA 9, 1980), *cert den* 453 US 914 (1981) (20-minute detention in the back of a patrol car was an unjustifiable detention for custodial interrogation). The defendant was transported from one place to another in search of a crime, detained for custodial interrogation, and subjected to more than a brief stop for on-the-scene questioning and investigation without probable cause for arrest.

### Summers

Even if *Dunaway* does not clearly foreshadow the inappropriate nature of the instant detention, the detention is not supported by an ultimate standard of reasonableness which is less than probable cause but greater than reasonable suspicion. See *Michigan v Summers, supra. Summers* noted and restated the general rule applied in *Dunaway* "that an official seizure of the person must be supported by probable cause, even if no formal arrest is made". 452 US 696. The *Summers* Court then reviewed *Terry v Ohio* and its progeny and concluded that:

"[S]ome seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as

police have an articulable basis for suspecting criminal activity". 452 US 699.

The *Summers* Court stated that limited intrusions on personal security are not confined to momentary on-the-street detentions accompanied by a frisk for weapons. Nor need the *Terry*-type stop be limited to the brief time period of *Terry*. 452 US 700, fn 12. In that footnote, the *Summers* Court quoted the views of one commentator, also quoted in plaintiff's brief in the case at bar:

"It is clear that there are several investigative techniques which may be utilized effectively in the course of a *Terry*-type stop. The most common is interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained. Sometimes the officer will communicate with others, either police or private citizens, in an effort to verify the explanation tendered or to confirm the identification or determine whether a person of that identity is otherwise wanted. Or, the suspect may be detained while it is determined if in fact an offense has occurred in the area, a process which might involve checking certain premises, locating and examining objects abandoned by the suspect, or talking with other people. If it is known that an offense has occurred in the area, the suspect may be viewed by witnesses to the crime. There is no reason to conclude that any investigative methods of the type just listed are inherently objectionable; they might cast doubt upon the reasonableness of the detention, however, if their use makes the period of detention unduly long or involves moving the suspect to another locale." 3 LaFave, Search and Seizure, § 9.2, 36-37. (Footnotes omitted.)

In the most recent supplement to his treatise, Professor LaFave also notes that transportation of a suspect a short distance (almost always for viewing by witnesses) does not, standing alone, make a

detention an arrest. LaFave, *supra,* § 9.2, p 10, fn 93.3 (1982 Supp). Yet, as he suggests in this material, transportation for viewing by witnesses should be dependent upon knowledge that a crime has been committed. Our law must be more protective of liberty if there has not been any report of a crime. See *People v Lippert,* 89 Ill 2d 171, 186-187; 59 Ill Dec 819; 432 NE2d 605 (1982). The facts in the instant case show that there had been no reports of any crime in the area. This was not a transportation for a show-up.[9]

The analysis in *Summers* focused on examining "both the character of the official intrusion [on a person's liberty] and its justification".[10] 452 US 701. Of prime importance in assessing the intrusion is that in *Summers* the police had obtained a warrant to search the respondent's house for contraband. The warrant is the linchpin to the holding in *Summers.* However, the *Summers* decision did not preclude the *possibility* of justifying similar police conduct without a warrant if the warrant requirement is excused by exigent circumstances. 452 US 702, fn 17. Upon close analysis, whether a warrant is required or not, it seems that the requirement of probable cause to believe that a crime has been committed at the place to be searched must remain. The instant case does not

[9] The prosecutor argues that a *Dunaway*-type analysis would preclude retaining a suspect for a prompt on-the-scene identification. We are not faced with that type of police investigation technique and we express no opinion as to whether such a "show-up" may be conducted on less than probable cause.

[10] The *Summers* decision does not help in clearing up Fourth Amendment doctrine. The Court does not identify the specific level of cause necessary for the *Summers*-type detention. It does use a reasonableness approach, yet focuses on the intrusiveness of the seizure rather than the level of cause. The opinion does not define the level of "intrusiveness" necessary to trigger a balancing test between the freedom from an intrusive seizure and the asserted law enforcement interests.

present a level of cause equal to the probable cause requirement concerning the existence of a crime.

The official intrusion in *Summers* was a limited and incremental intrusion on personal liberty, according to the Court's analysis, because (1) a warrant had been obtained, (2) the detention was less intrusive than the search of the occupant-detainee's home, (3) the information sought by the officers would normally be obtained through the search and not by exploiting the detention, (4) the detention was in the accused's own residence, presented only an incremental addition to its public stigma separate from the search, and did not involve the indignity and inconvenience related to a compelled visit to a stationhouse, and (5) the detention was not designed to provide an opportunity for interrogation and did not have coercive aspects similar to those in *Dunaway*.

Reviewing these factors in light of the instant case indicates that the detention in a "roving" police car is significantly more intrusive than the *Summers*-type detention. No warrant was issued, nor could a warrant be issued since there was no probable cause to believe that a crime had been committed. There was no search based upon probable cause. Thus, the detention cannot be said to be less intrusive than a search.

The detention, seizure, and transportation of the defendant in the instant case presents a significant intrusion. We are not faced with a detention that merely continued during a "probable-cause search" of defendant's automobile or other property interests. There was no intrusion affecting property which required or which would indicate a desire by defendant to be present.

Given the questioning of the defendant, it can-

not be concluded that the information sought would not be obtained through the detention. Furthermore, unlike *Summers,* the other information sought, whether a crime had been committed, would not be made more discoverable as a result of the defendant's presence.

The public stigma associated with a detention in a police car is greater than the stigma associated with detention in one's home. Unlike the home, the police-car type of detention is a public detention. It could occur in open view of friends, neighbors, or business associates. Again, unlike *Summers,* there was no independent intrusion such as the warrant search which resulted in some stigma. It is certainly more inconvenient, in general, to be detained in a police car than in one's home. This is certainly more likely if the detention in the car also involves transportation elsewhere.[11]

The transportation of the defendant, seeking out a potential break-in, as opposed to holding him at the scene, the prosecutor argues, is constitutionally irrelevant. We cannot agree. Even assuming that it might have been proper to detain defendant at the place of the stop, the transportation in this case did not involve a *de minimis* intrusion. Being told to stand outside a car as opposed to sitting in the car may be a permissible *de minimis* intrusion, *Pennsylvania v Mimms,* 434 US 106; 98 S Ct 330; 54 L Ed 2d 331 (1977); being driven around is not. Not only is the citizen's travel interrupted, but he is no longer proceeding along the same route. In fact, the citizen's mobility has been totally usurped

---

[11] We recognize that not every citizen who sits in a moving or stationary police car is detained. Nor is every person who is asked to sit in a police car necessarily subject to a significant intrusion. The case at bar goes substantially beyond a momentary intrusion at the scene or a person filling out an auto accident report or a similar situation.

and directed elsewhere. Furthermore, unlike the *Mimms* case, the instant case does not involve an intrusion justified by concern for an officer's safety. The facts in this case reflect more than just a brief investigatory detention at the scene.

Finally, for two reasons, the instant detention is closer to a compelled visit to a police station with the related opportunity for interrogation. First, as explained above, a detention in a "roving" police car has coercive aspects. The instant case involved a detention which included interrogation as a purpose. Second, a formal arrest involves transportation of the suspect. A seizure accompanied by transportation of the person is thus closer in description and action to a formal arrest requiring full probable cause. Accordingly, we conclude that the intrusion is of a different nature and is more substantial than the intrusion in *Summers.*

We are not unmindful, however, that our balancing analysis must also assess the governmental justification for the intrusion. A stronger justification than was present in *Summers* could tip the scale to the *Summers* level, although the intrusion is greater than the *Summers* type.

As the *Summers* Court noted, it is important to focus upon the law enforcement interest and the nature of "articulable facts" supporting the particular detention when assessing the justification for an intrusion. These law enforcement interests include (1) preventing flight, (2) minimizing the risk of harm to an officer, and (3) facilitating an orderly completion of a search.

Although a close analysis might reveal some differences, we may assume that the first two interests are present in many, if not most, criminal investigations and detentions. Here the officers were in full control of the movement of the sus-

pect. Furthermore, he was clearly identified and his address known. The third interest is obviously not present in the instant situation; ·nor is any similar interest. The investigation of businesses in the area to determine if a crime had been committed was not aided or hindered by the presence of the defendant.

The factors in *Summers* concerning "the nature of the articulable and individual suspicion" justifying detention are (1) an incremental intrusion in addition to the search authorized by a magistrate who found probable cause, (2) the warrant itself, which indicates a neutral assessment of probable cause by the magistrate, and (3) the connection of the occupant to the place being searched, in *Summers* his home.

It appears that when these suspicion-related factors are present the Supreme Court has concluded that the officer on the street does not have to evaluate the level of cause requirement or the effect of the intrusion that is necessary as a result of the seizure. *Summers,* p 705, fn 19. *Cf. Dunaway,* p 213 (disapproving a view that would require police officers to engage in balancing and evaluating the "multifarious circumstances presented by different cases"). These factors are not present in the case at bar. Detention and transportation of the suspect from place to place amounted to the intrusion. There was no warrant or probable cause determination or even reasonable cause determination made by anyone other than the officer on the street.[12]

---

[12] Some commentators have suggested a sliding scale or middle-tier approach—one between reasonable suspicion and probable cause. See, *e.g.,* Grano, *Criminal Procedure, 1976 Annual Survey of Michigan Law,* 23 Wayne L Rev 517, 529-533 (1977). However, we decline to adopt this approach. If our courts and law enforcement officers are to have manageable and workable standards, the *Terry* balancing of personal and governmental interests "must in large part be done on a categori-

Accordingly, we conclude that, even when applying the *Summers*-type balancing approach, the police conduct present in the instant case resulted in a violation of the defendant's federal and state constitutional rights. The intrusion in the instant case was greater than a *Summers*-type intrusion. In addition, the justification for the intrusion was not as strong in this case. The scale is tipped in favor of the citizen's right to be free from unreasonable seizure. If authorities, acting without probable cause, can seize a person, transport the person from place to place in search of a crime, and keep him available for arrest in case probable cause is later developed, the requirement of probable cause for arrest has been turned upside down.

Finally, although we have centered our analysis with respect to the facts of this case on the contours of the federal *Dunaway* and *Summers* decisions, we apply this rationale pursuant to Const 1963, art 1, § 11. We hold that defendant was deprived in an unreasonable manner of his state, as well as federal, constitutional rights. See, *e.g.,* *People v Beavers,* 393 Mich 554; 227 NW2d 511 (1975).

### III. Seizure of Property

As noted, the prosecutor does not assert that the police had an independent basis for seizing the property found in the defendant's automobile. At oral argument, the prosecutor contended that the propriety of the seizure of the property depended upon the propriety of the seizure-detention of the

cal basis—not in an ad hoc, case-by-case fashion by individual police officers". *Dunaway, supra,* 442 US 219-220 (White, J., *concurring).* Furthermore, the sliding scale or middle-tier approach risks confusion by converting "the fourth amendment into one immense Rorschach blot". The sliding-scale test is likely to "produce more slide than scale." Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn L Rev 349, 393, 394 (1974).

person. Although noting that the items were seized prior to defendant's formal arrest, the prosecutor argued that "if the detention is not unconstitutional, the items should be admitted because they were found properly, or would have been taken from his care properly. The timing shouldn't be the thing that is key".

The obvious corollary of this view is that if the detention was improper so was the seizure. The detention and transportation of the defendant while seeking out evidence of a burglary was improper. Thus the seizure of the property was not justified since no other justification is advanced supporting this warrantless seizure without probable cause.

Finally, the prosecutor argues that the exclusionary rule should not apply to the instant case. He argues for a "good-faith exception" to that rule. We agree with the views in Justice Marshall's majority opinion in *Taylor v Alabama,* 457 US 687, 693; 102 S Ct 2664; 73 L Ed 2d 314, 321 (1982): "To date we have not recognized such an exception, and we decline to do so here."

For the reasons herein set forth, the detention of the defendant was an unreasonable seizure under federal and state constitutional principles. Accordingly, the judgment of the Court of Appeals is affirmed.

FITZGERALD, C.J., and KAVANAGH and LEVIN, JJ., concurred.

WILLIAMS, J. I concur on the basis that it was assumed that original action was without probable cause, which may have been arguable.

COLEMAN and RYAN, JJ., concurred with WILLIAMS, J.

RILEY, J., took no part in the decision of this case.