624 So.2d 1249 (1993)
STATE of Louisiana
v.
James JONES.
No. 93-KA-210.
Court of Appeal of Louisiana, Fifth Circuit.
September 15, 1993.
*1250 John M. Mamoulides, Dist. Atty., Howat Peters, George Hesni, Dorothy A. Pendergast, Asst. Dist. Attys., Gretna, for plaintiff/appellee.
Ike Spears, New Orleans, for defendant.
Before BOWES, DUFRENSE and WICKER, JJ.
BOWES, Judge.
Defendant, James Jones, was charged by bill of information with possession of over 400 grams of cocaine in violation of La.R.S. 40:967 F. He pled guilty pursuant to State v. Crosby, 338 So.2d 584 (La.1976) to the reduced charge of possession of cocaine between 200 and 400 grams. He was sentenced to ten years at hard labor and fined $150,000.00. The payment of the fine was suspended. The defendant now appeals urging as error the trial judge's denial of his motion to suppress evidence allegedly illegally seized. We affirm.

FACTS
The motion to suppress hearing set forth the following. Detective Glenn Davis of the Jefferson Parish Sheriff's Office Narcotics Division testified that on June 30, 1992, while assigned to the New Orleans International Airport, he participated in the arrest of defendant. At approximately 8:40 a.m. on that day, he and his partner, Officer Wende Juncker, were conducting surveillance of a flight from Los Angeles, California, a source city for drugs. The officers' attention was drawn to the defendant because he was one of the last passengers to deplane the aircraft, and as he exited the plane, he made direct eye contact with Agent Juncker. Further, as the defendant turned to walk up the concourse, he appeared to be very nervous, looking back at the officers several times. At that point Detective Davis began following the defendant up the concourse, walking approximately ten feet behind him. The defendant began to walk in a very rapid pace up the concourse towards the lobby, at which point he turned and looked at the officer again. The defendant then walked across the lobby and proceeded down the escalator to the baggage claim area, looking at the officer in the reflection board. Once the defendant arrived at the baggage claim area, *1251 he positioned himself by the turnstile belt to await his luggage. He continually paced back and forth and appeared to the officers to be very nervous.
After several minutes of pacing and waiting for luggage, he walked over to a skycap and asked him the location of the men's room. The defendant then walked over to the men's room which was situated to the left of the baggage claim area. Once in the men's room, he then turned around immediately and walked directly out and proceeded to a pay phone located on the outside of the baggage claim area. He made a phone call and, after a brief conversation, he hung up the phone, walked through the exit door and towards the taxicab stand without picking up his luggage.
At this point Detective Davis approached the defendant from the left while Agent Juncker approached from the right. The officers, who were dressed in plain clothes, produced their identifications, advised the defendant they were police officers, and requested permission to speak to him. After the defendant agreed, Juncker asked him where he was arriving from and whether he was in possession of an airline ticket. In response, he handed her the ticket which was under the name of D. Smith. In response to additional questioning, the defendant told the officers that his name was James Jones, and that he had received the ticket from Mr. D. Smith in California.
He was then asked if he had identification, at which time he produced a California driver's license under the name of James Jones. When asked the purpose of his visit, he replied that he had come to New Orleans to visit friends. During their conversation, Officer Davis observed two claim checks for bags which were stapled to the defendant's ticket. The defendant informed the officer that he had two bags checked in on the flight and planned to retrieve them after he got a cab.
Pursuant to the officers' request, the defendant voluntarily agreed to step back into the terminal to answer a few more questions. Davis advised Jones that they were narcotics detectives and requested consent to search the bag the defendant had in his possession. Jones immediately agreed and handed Officer Davis the carry-on bag. The officer unzipped the bag and observed an airline ticket for that same day, leaving New Orleans going back to California through Denver, Colorado, under the name of J. Parker. The officer also found a note pad containing a travel itinerary detailing the flight that Jones had come in on and also detailing the return flight to California that same day.
Agent Juncker then walked over and retrieved the two bags that matched the claim checks stapled to the airline ticket. Jones identified the two bags as his, but claimed that he only packed the larger of the two bags and that the smaller bag had been given to him from someone in California to deliver to New Orleans. He responded that he did not know what was in the smaller of the two bags. Both bags were secured with small padlocks attached to the zippers on the bags. The defendant then agreed, without hesitation, to accompany the officers to the police room so that they could continue their investigation.
As Detective Davis and the defendant walked to the police room, Agent Juncker and a uniformed police officer followed behind. On the way to the police room, Davis asked the defendant if he was receiving any monetary reward for delivering the bag to New Orleans. Jones replied that he was, but he refused to say the amount that he was to receive.
Once in the police room, Davis asked the defendant for the keys to the two bags. When Jones replied that he did not have a key for either bag, the officer requested permission to cut the locks off. The defendant's response was "sure, why not." The officer got a small hacksaw and cut the padlock off the smaller of the two bags. When he opened the bag, he smelled a strong scent of fabric softener which he knew is often used to disguise the scent of drugs. Inside the bag the officer observed three pillows. In the middle of the three pillows was a package wrapped in a clear cellophane wrapper which contained six square-shaped objects, each wrapped with fabric softener sheets and each about the size of a kilo of cocaine. The *1252 officer performed a field test on two of the packages. When the test proved positive for the presence of cocaine, the defendant was placed under arrest and advised of his Miranda rights. The officer then opened the second bag; however, it did not contain any narcotics.
The defendant was then transported to the detective bureau. He made several statements to the officer at the detective bureau after being advised of his rights. Specifically, he informed the officer he was told to check in at the Travel Lodge on Williams Boulevard under his name. He was then to go to the room and leave the bag that contained the six kilos of cocaine in the room, go back to the airport and catch a flight later that evening back to California. Pursuant to a question by the officer, Jones further stated that the day prior to his travels he met a person in the California area in front of a vacant apartment building, that he was taken up to a room in this building, and was given the bag that contained the cocaine, the two airline tickets, $1,000.00 in cash, and instructions on what to do. When asked if he knew the person's name who gave him the cocaine defendant stated, "These kind of people don['t] give you their names."
After the testimony of Detective Davis, the defense called Agent Wende Juncker, of the Jefferson Parish Sheriff's Office, as the first witness. She testified that while assigned to the airport narcotics unit she participated in the arrest of the defendant. She testified that the uniformed officer joined them after she retrieved the bags from the carousel and after Officer Davis had looked through Jones' small carry-on bag. The agents called a uniformed officer because they were afraid, by some of defendant's movements, that he would try to flee the airport. When the uniformed officer arrived, he was standing about 20 feet from the defendant.
She further testified that after she summoned a uniformed officer, she went to Sergeant Davis who showed her the defendant's ticket for departure for the same afternoon. At that point, she felt that they had enough to detain Jones.
On cross-examination, Agent Juncker testified that she heard Jones give Sergeant Davis permission to search his carry-on bag and the two larger bags. In her presence, no one did anything to force or coerce defendant into giving this permission.
Jones then testified on his own behalf. He stated that when he arrived in New Orleans, he was first made aware that the officers wanted to talk to him when Officer Davis approached him as he walked outside to get a cab. He agreed to talk to the officers at that time and handed Davis his California driver's license under the name of James D. Jones. When the officer asked him if he could look in his small carry-on bag, Jones said "no". Jones then accompanied the officers inside the airport, still in possession of his carry-on bag. Once inside, he said Officer Davis unzipped the defendant's bag and looked in it as they were talking, despite the fact that he did not give him permission to look in the bag. In addition, he claimed that he did not give the officers permission to retrieve his luggage from the turnstile. After the officers took the defendant's bags, they brought him to an investigation room. By this time, a uniformed officer had joined them. Jones testified that when the officers first approached him by the cab area, he did not feel that he was free to leave at that time. Once inside the police room, the officers asked to search Jones' two bags from the turnstile. Despite the fact that Jones said he did not make any response to their request, they searched his two bags after they sawed the locks off.
On cross-examination, Jones testified that the first time the officers told him, or the first time he knew without doubt, that he could not leave was when he was placed under arrest. Jones also denied giving the officers any statement about getting money to bring the bags to New Orleans or about how he got the bags.
After considering the above testimony and argument of counsel, the trial judge obviously believed the testimony of the officers over that of the defendant and denied defendant's motion to suppress.
The defendant assigns the following errors on appeal:
*1253 1. The officers did not have articulable reasonable suspicion sufficient to approach and detain Jones; and
2. The encounter between Jones and officers Davis and Juncker was an unlawful arrest.

DISCUSSION
Defendant argues that the officers did not have reasonable suspicion at the time they detained him. More specifically, defendant contends that:
... the officers admittedly did not know in what city Mr. Jones had boarded the airplane, even though the airplane had departed from more than one city. There was no indication whatsoever that Mr. Jones might be a drug courier. The officers could not articulate any facts supportive of a reasonable suspicion. The[y] merely recited allegations that the petitioner appeared nervous, made eye contact with Officer Davis, briefly went into the restroom, and briefly made a phone call. Even if these allegations were all true, given the fact that Mr. Jones was a traveller arriving in a new city after a long flight these incidental occurrences would not amount to a solid hunch much less a reasonable suspicion.
It is also defendant's position that a seizure occurred when the officers ordered him to display his identification, hand over his ticket and return to the terminal. Thus, since the officers did not have reasonable suspicion to detain defendant, the subsequent seizure of evidence was illegal and in violation of defendant's fourth amendment rights.
We believe that the threshold issue here is at what point did a seizure occur so as to invoke the protections afforded by the Fourth Amendment. It must then be determined if the officers had reasonable suspicion to justify a "seizure" of defendant.
Both the United States and the Louisiana Constitutions prohibit unreasonable searches and seizures. U.S. Const. Amend. 4; La. Const. Art. 1, Sec. 5. However, the purpose of these provisions is not to eliminate all contact between law enforcement officers and citizens, and as long as a reasonable person would feel free to walk away, there has been no seizure.
In Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Supreme Court set forth the distinction between a permissible encounter and a seizure as follows:
Second, law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. See Dunaway v. New York, supra, 442 U.S. [200], at 210, n. 12, 99 S.Ct. [2248], at 2255, n. 12 [60 L.Ed.2d 824 (1979) ]; Terry v. Ohio, 392 U.S. [1], at 31, 32-33, 88 S.Ct. [1868], at 1885-1886 [20 L.Ed.2d 889 (1968)] (Harlan, J. concurring); id. at 34, 88 S.Ct. at 1886 (WHITE, J., concurring). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. United States v. Mendenhall, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. Terry v. Ohio, 392 U.S., at 32-33, 88 S.Ct., at 1885-1886 (Harlan, J. concurring); id., at 34, 88 S.Ct., at 1886 (WHITE, J. concurring). He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. United States v. Mendenhall, supra, 446 U.S., at 556, 100 S.Ct., at 1878 (opinion of Stewart, J.). If there is no detentionno seizure within the meaning of the Fourth Amendmentthen no constitutional rights have been infringed.
In United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), reh. den., 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980), it was further stated:

* * *

*1254 We conclude, that a person has been `seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. See Terry v. Ohio, supra, 392 U.S., at 19, n. 16, 88 S.Ct., at 1879, n. 16; Dunaway v. New York, 442 U.S. 200, 207, and n. 6, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824; 3 W. LaFave, Search and Seizure 53-55 (1978). In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person. (footnote omitted)
Even though a person is "seized" for the Fourth Amendment purposes, law enforcement officers have the right to stop and interrogate persons reasonably suspected of criminal conduct. LSA-C.Cr.P. art. 215.1[1]Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
In Terry supra, the Supreme Court stated:
And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search `warrant a man of reasonable caution in the belief' that the action taken was appropriate? Cf. Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Beck v. State of Ohio, 379 U.S. 89, 96-97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964). (footnotes omitted)
Although not specifically stated in Terry, supra, the United States Supreme Court in United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) unequivocally stated that reasonable suspicion of criminal activity warranted a temporary seizure to conduct questioning limited to the purpose of the stop.
In U.S. v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the United States Supreme Court addressed the concept of reasonable suspicion, stating as follows:
The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or `hunch'". Id. at 27, 88 S.Ct., at 1883. The Fourth Amendment requires "some minimal level of objective justification" for making the stop. INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a Terry stop is obviously less demanding *1255 than that for probable cause. See United States v. Montoya de Hernandez, 473 U.S. 531, 541, 544, 105 S.Ct. 3304, 3310, 3312, 87 L.Ed.2d 381 (1985).
The concept of reasonable suspicion, like probable cause, is not "readily, or even usefully, reduced to a neat set of legal rules." Gates, supra, 462 U.S., at 232, 103 S.Ct., at 2329. We think the Court of Appeals' effort to refine and elaborate the requirements of "reasonable suspicion" in this case creates unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment. In evaluating the validity of a stop such as this, we must consider "the totality of the circumstancesthe whole picture." United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). As we said in Cortez:

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same and so are law enforcement officers." Id. at 418, 101 S.Ct., at 695.
U.S. v. Sokolow, 490 U.S. at p. 8, 109 S.Ct. at pp. 1585-1586.
After discussing reasonable suspicion, the Supreme Court in Sokolow concluded that the DEA agents had reasonable suspicion to conduct an investigative stop of a suspected drug courier based on the following information: (1) defendant paid $2100.00 for two round-trip plane tickets from a roll of $20.00 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage. The Supreme Court concluded that any one of these factors is not by itself proof of illegal conduct and is quite consistent with innocent travel, however "we think taken together they amount to reasonable suspicion." The Sokolow opinion dealt directly with the probative value of the factors comprising the drug courier profile, stating as follows:
We do not agree with respondent that our analysis is somehow changed by the agents' belief that his behavior was consistent with one of the DEA's "drug courier profiles". Brief for Respondent 14-21. A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a "profile" does not somehow detract from their evidentiary significance as seen by a trained agent. (Emphasis added)
U.S. v. Sokolow, 490 U.S. at p. 10, 109 S.Ct. at p. 1587.
This Court in State v. Davis, 547 So.2d 1367 (La.App. 5 Cir.1989). writ denied, 556 So.2d 53 (La.1990), thoroughly discussed the law on airport detentions in light of the United States Supreme Court case discussed above. In Davis, this Court concluded under a "totality of the circumstances" standard, that the following facts justified an investigatory stop: (1) defendant arrived in New Orleans aboard a non-stop flight from Los Angeles, a known source city for drugs; (2) he was one of the first passengers to deplane and his nervous demeanor attracted the attention of the officer; (3) as defendant walked up the concourse, he kept looking around to see if he was being watched or followed; (4) at the baggage claim area, defendant paced nervously until the flight bag arrived and he kept looking to see if he was the subject of surveillance; (5) after claiming a single piece of luggage, he went to the cab stand, still acting nervously; (6) when the detective approached him at the cab stand, defendant agreed to speak with him and further agreed to produce his airline ticket and driver's license. At this time, the officer noticed his hands were trembling; (7) the airline ticket was a one-way ticket purchased with cash; and (8) defendant's speech became broken and his breathing became labored. It was at this point the detective identified himself as a narcotics officer and asked defendant if he was carrying any contraband or drugs.
*1256 The court, in Davis, concluded that the foregoing facts, considered under a "totality of the circumstances" standard, constituted sufficient grounds for the trial court's finding that reasonable suspicion justifying an investigatory stop of defendant existed.
In State v. Garriga, 592 So.2d 453 (La. App. 5 Cir.1991), writ denied, 596 So.2d 553 (La.1992). This court again found that the officers had reasonable suspicion to justify an investigatory stop based on the following facts: (1) defendant was arriving on a flight originating in Los Angeles, a source city for drugs; (2) as defendant exited the plane and walked up the concourse, he repeatedly peered over his shoulder, looking around in a nervous manner; (3) defendant made prolonged eye contact with the officers; (4) while in the baggage claim area, defendant kept looking around nervously; (5) he retrieved one bag, exited the airport, and asked for a cab to take him to the Sheraton downtown; (6) when the officers approached defendant at the cab stand, defendant agreed to speak with them and further agreed to produce his airline ticket and driver's license. At this time, the officers noticed that defendant became increasingly nervous and his breathing became labored; (7) the airline ticket was a one-way full fare ticket purchased with cash. It was at this point the officers identified themselves as narcotics detectives and asked for consent to search defendant's bag.
In the present case, after a careful review of the record, we find that there was no "seizure" within the meaning of the Fourth Amendment when the officers first approached defendant. U.S. v. Mendenhall, supra. There is no indication that defendant was not free to leave or walk away from the initial encounter. The officers were not in uniforms nor did they display any weapons. Moreover, the entire encounter appears to have taken place with defendant's consent. We also note that the encounter occurred in a public area.
After the initial questioning, defendant, without objection, produced his airline ticket and driver's license pursuant to the officer's request. His driver's license was in the name of James Jones and his ticket was in the name of D. Smith. Certainly, this is a recognized suspicious circumstance. The officer also observed that stapled to defendant's airline tickets were two claim checks for bags that defendant had not yet retrieved. It was at this point the officers identified themselves as narcotics detectives, asked defendant to step back into the terminal and further requested consent to search the carry-on bag defendant had in his possession.
We conclude, at this point, that the encounter was transformed from consensual in nature to an investigatory stop within the meaning of Terry, supra. We have applied the "totality of the circumstances" standard to the facts before us and find that the officers did have reasonable suspicion to justify such a stop. In doing so, we note that the following facts support a conclusion that the officers, well trained in narcotics surveillance, had reasonable suspicion to detain defendant:
(1) Defendant was arriving on a flight originating in Los Angeles, a well known source city for drugs.
(2) He was one of the last passengers to exit the plane, making direct eye contact with the officers when he did.
(3) As he walked up the concourse, he appeared to be very nervous and looked back at the detective several times.
(4) He began to walk very rapidly towards the baggage claim area when he noticed the officer behind him.
(5) Once in the baggage claim area, defendant continuously paced back and forth rapidly and still appeared to be very nervous.
(6) Defendant left the baggage area without his luggage, proceeded to the men's room, but then turned around immediately and walked directly out.
(7) Defendant then made a brief phone call and walked over to the cab stand, still without obtaining his luggage.
(8) When the officers approached defendant at the cab stand, defendant agreed to speak with them and further agreed to produce his airline ticket and driver's license.
*1257 These two documents were in different names.
It was at this point that the officers asked defendant to step back inside the terminal and asked for consent to search his carry-on bag.
These facts, as previously set forth, are sufficient to give the officers reasonable suspicion to justify an investigatory stop of defendant, especially given these facts must be considered in light of the fact that the officers have specific training in narcotics surveillance and considerable experience on the narcotics squad in airport surveillance. State v. Davis, supra, and State v. Vanderlinder, 575 So.2d 521 (La.App. 5 Cir.1991), writ denied, 580 So.2d 377 (La.1991).
We are mindful of the recent decision in State v. Moreno, 619 So.2d 62 (La.1993) and find that case distinguishable on its facts from this matter before us. The facts of that case, as set forth by the court, are as follows:
On May 7, 1990, Officers Simone and Cummings were at the New Orleans International Airport, detailed to watch incoming flights from "source cities." One passenger arriving on Flight 1076 from Miami caught their attention. The officers testified that a thirty-eight year old Hispanic female, later identified as defendant Olga Moreno, walked through the concourse in a hurried fashion. She looked nervously over her shoulder and from side to side; she held a purse and one carry-on bag. Believing this behavior and her departure point of Miami to be consistent with a `drug courier profile,' the officers began a surveillance. They followed as she made her way downstairs and walked through the baggage claim area without claiming any luggage. After she exited the airport they stopped her, introduced themselves, and asked if she would speak with them. She agreed, telling the officers that she was travelling alone and had just arrived from Miami. Officer Simone asked her to produce some identification and her ticket. Although Ms. Moreno was unable to find her ticket, she did produce an identification card and an American Airlines stub for seat 22-A.
Noticing that the stub showed seat 22-A assigned to a person named "Perez" while the identification card listed the name "Moreno," Simone suspected that Moreno was travelling under an alias, another element of the drug profile. Moreno's explanation was that she had bought her ticket from "a man at the airport in Miami." She also indicated that she was having trouble understanding the officers. They asked her to accompany them inside, where an interpreter would be found.
The officers led her to the Southwest Airlines baggage claim office and called in a bilingual airline employee. Through the interpreter, the officers asked the same questions and received the same answers. Under further questioning, Moreno said that she had been in Miami visiting friends for about three weeks.
Simone left Moreno alone with Cummings in the baggage claim office and went to the American Airlines ticket counter. While there, Simone learned that seat 22-A had been assigned to a passenger ticketed as "Velma Perez" and that seat 22-B had been assigned another ticketed as "Susanna Perez." He also learned that both seats had been booked at the same time by the same travel agency. When Simone returned, he further questioned Moreno about her travel arrangements. Moreno denied knowing a Susanna Perez and reiterated that she was travelling alone.
The detective then asked if he could search her purse and carry-on bag. She did not object. When Simone found only toiletries and a small amount of clothing in the small bag, he asked why she carried so little clothing. Moreno replied that she had left some of her belongings at her friend's house. The detective then asked if Moreno would consent to a full body search. When Moreno refused, stating that the officers needed "a paper" to search her, Simone immediately informed her that she was "detained," and that she would have to accompany them to their office on the second floor, where she would have to wait until they could get a search warrant. Simone's testimony indicated that Moreno was not free to leave after this point.

*1258 The officers then proceeded with Moreno from the baggage claim area up to the lobby area on the next level of the airport. As they were proceeding through the lobby in order to go up to the detectives' office on the floor above the lobby, they stopped at the American Airlines ticket counter to check the flight number and actual arrival time of Moreno's flight so that information could be included in an application for a search warrant. At this point, Simone left Moreno in the custody of Cummings and stepped away to look at the flight information board. Moreno asked Cummings where they were going, and Cummings told Moreno that they were going to get a search warrant. Moreno then told Cummings that a warrant would be unnecessary and that she would turn over the drugs she was carrying. Agent Cummings took Moreno into the women's restroom,. where Moreno produced a small bag of cocaine from her person.
After consideration of applicable law, the Louisiana Supreme Court held, in a 4-3 decision, that the officers extended the primary investigatory stop further than warranted by the totality of the circumstances. In so ruling, the court stated that, assuming arguendo that the officers had reasonable suspicion to justify the initial stop, when the officers took Moreno into custody and forced her to walk toward the office on the second floor, after she refused to consent to a full body search, Moreno was, in effect, under arrest and "under the totality of the circumstances known to the officers at the time of arrest, there did not exist sufficient facts to justify the officer's belief that Ms. Moreno had committed a crime." At p. 66.
We are of the opinion that a comparison of Moreno with the case sub judice reflects that they are factually distinguishable; Moreno initially refused to submit to a body search and was thereafter not only detained, but arrested, whereas defendant Jones, according to the officers' version of the facts (which was believed by the trial judge), was cooperative and consented to the whole encounter, including the search of his bags which led to the officers having probable cause to arrest. Moreover, it appears that the officers had more facts in their possession at the time of Jones' investigatory stop than they had at the time Moreno was initially detained.
We therefore find that the facts known to the officers at the time of the initial stop of defendant were sufficient to justify a reasonable suspicion on the part of the officers. Accordingly, the trial court did not err in denying the motion to suppress.
In addition, we have reviewed the record for errors patent in accordance with LSA-C.Cr.P. art. 920 and State v. Oliveaux, 312 So.2d 337 (La.1975) and find that the defendant was not given credit for time served. Since LSA-C.Cr.P. art. 880 is mandatory in nature, defendant is entitled to credit for time served. See State v. Lee, 600 So.2d 796 (La.App. 5 Cir.1992).
Accordingly, the defendant's conviction is affirmed. The sentence is amended to provide that defendant receive credit for time served and, as amended, the sentence is affirmed.
CONVICTION AFFIRMED. SENTENCE AMENDED AND, AS AMENDED, AFFIRMED.
WICKER, J., dissents.
WICKER, Judge, dissenting.
I respectfully dissent from the majority in concluding State v. Moreno, 619 So.2d 62 (La.1993) is distinguishable. On the contrary, I believe it to be dispositive. Even assuming the initial investigatory stop and questioning were justified, Jones' constitutional rights were violated in his arrest without probable cause. In Moreno, the Supreme Court held that when the defendant was told she would have to accompany the officers to another location after refusing a body search "the officers exceeded the limited bounds of an investigatory stop." Id. at 65-66. The Louisiana Supreme Court cited with approval People v. Bloyd, 416 Mich. 538, 331 N.W.2d 447 (1982) for holding that "[t]he transportation of a suspect, even of a short distance, is more intrusive than a mere stop." Id. at 66. At the hearing in the present case Officer Juncker testified that a uniformed officer joined them because the officers feared Jones would flee. Juncker also testified *1259 that after she summoned the additional uniformed officer she saw from Officer Davis the defendant had a ticket to return the same afternoon. It was at this point she felt she had enough to detain Jones. Jones was escorted to the police room in the airport by Officers Davis, Juncker and a uniformed police officer.
The Moreno court explained at 66:
Under Louisiana law, in order to make a valid arrest without a warrant, an officer must have reasonable (probable) cause to believe that the person to be arrested has committed an offense. Reasonable cause to arrest exists when the facts and circumstances known to the arresting officer and of which he has reasonable, trustworthy information are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. [citations omitted; emphasis in original].
In Moreno the court noted at 66-67:
At the time of Ms. Moreno's arrest, the officers only knew that (1) Ms. Moreno was arriving in New Orleans from Miami, (2) she looked over her shoulder a couple of times while the officers followed her, (3) she possibly had used a ticket originally issued to another person or issued to her under a different name, (4) she had no luggage other than her purse and a carry-on bag, (5) a search of the purse and the carry-on bag revealed no illicit drugs or criminal evidence and (6) she refused to submit to a body search without a warrant. Officers Simone and Cummings did not have probable cause to arrest Ms. Moreno, because, under the totality of the circumstances known to the officers at the time of the arrest, there did not exist sufficient facts to justify the officers' belief that Ms. Moreno had committed a crime.
The fact that Moreno said she bought her ticket from a man at the Miami airport but was carrying a ticket stub issued to "Velma Perez" was suspicious but did not constitute probable cause to believe that she was committing an offense. Therefore, the officers were justified only in using the least intrusive means reasonably available to verify or dispel the suspicion in a short period of time. If such brief, lesser intrusive means were available, the officers did not use them. Instead, they precipitously arrested Moreno, taking her into custody and forcing her toward their second floor office, although they had exhausted the grounds and scope of the investigatory stop and clearly did not have probable cause or valid grounds for arrest. [citations omitted].
* * * * * *
Since the officers had no probable cause to arrest the defendant, the subsequent "consent" to turn over the contraband was thereby vitiated ...
Similarly, at the time of Jones' arrest, i.e. his admitted detention by Agent Juncker, the officers only knew: (1) he arrived from Los Angeles, (2) he was one of the last to deplane, (3) he made direct eye contact with an officer, (4) he appeared nervous as he walked up the concourse, looking back at the officer several times, (5) he walked rapidly to the baggage claim area, (6) once in the claim area he paced back and forth, (7) he left the claim area without his luggage and went to the bathroom, made a call and walked to the cab stand, (8) his airline ticket and driver's license were in two different names, (9) he had a ticket for departure that afternoon, and (10) the search of his carry-on bag revealed no drugs or criminal evidence. As in Moreno, at 66:
under the totality of the circumstances known to the officers at the time of the arrest, there did not exist sufficient facts to justify the officers' belief that Ms. Moreno had committed a crime.
Additionally, Jones' "consent" to the search of the bag containing contraband was vitiated "as it was not sufficiently attenuated from the unlawful conduct to be a product of free will, considering the temporal proximity of the illegality and the consent, the lack of intervening circumstances, and the purpose and flagrancy of the misconduct." Id. at 67.
The Moreno court at 67 also cited with approval Florida v. Royer, 460 U.S. 491, 500-01, 103 S.Ct. 1319, 1325-26, 75 L.Ed.2d 229 (1983) wherein that court held:

*1260 Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment. These circumstances surely amount to a show of official authority such that "a reasonable person would have believed that he was not free to leave." [citation omitted].
Although Officer Davis testified Jones was arrested after the search of the bag containing contraband the testimony of Officer Juncker is that he was detained prior to the search of that bag. Her testimony is consistent with these circumstances wherein Jones' ticket was retained and a third uniformed officer was called to help escort him to the police room for fear he would flee. There was, therefore, a "show of official authority... [at that point] such that `a reasonable person would have believed that he was not free to leave.' Moreno, supra at 67 [quoting Royer, supra].
Accordingly, I would reverse the defendant's conviction and sentence; grant his motion to suppress and remand to the trial court for further proceedings in accordance with law.
NOTES
[1] Art. 215.1 reads as follows:

A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.
C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.