*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MICHAEL DAVID MIER,

        Defendant-Appellant.

UNPUBLISHED
August 19, 2025
8:41 AM

Nos. 358960; 358969
Ogemaw Circuit Court
LC Nos. 19-005274-FH
        20-005349-FH

Before: BORRELLO, P.J., and M. J. KELLY and TREBILCOCK, JJ.

PER CURIAM.

In Docket No. 358960, defendant, Michael David Mier, appeals as of right his convictions by jury of bank robbery, MCL 750.531, and two counts of armed robbery, MCL 750.529. In Docket No. 358969, defendant appeals as of right his convictions by the same jury of eight counts of making a false report of terrorism, MCL 750.543m. The trial court, applying a fourth-offense habitual offender enhancement under MCL 769.12, sentenced defendant to 288 months to 60 years in prison for bank robbery, two terms of 570 months to 70 years in prison for armed robbery, and eight terms of 380 months to 60 years in prison for making false reports of terrorism, with the sentences to run concurrently. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Defendant's convictions arose from a series of events on September 6, 2019. Starting around 8:00 a.m., a series of telephone calls making bomb threats were received by multiple schools and hospitals in the general surrounding area of Rose City. The telephone number used to place the bomb threat calls was traced to a prepaid Tracfone account that had been purchased on September 5, 2019, from a location approximately 1,600 feet from defendant's home. Around 9:15 a.m. on September 6, a bank in Rose City was robbed by a man wearing a hooded sweatshirt and a black Halloween mask. The man walked into the bank and demanded $50,000; bank employees testified that the man appeared to have a gun in his pocket. Witnesses from a nearby business saw a man leave the bank and walk onto an ORV (off-road vehicle) trail in the direction of a cemetery a short distance from the bank. Defendant's truck had been seen at the cemetery right before the robbery and was gone shortly after it. When officers attempted to effectuate a

-1-

traffic stop on defendant, he accelerated instead of stopping, and when officers forced the vehicle to a stop, defendant fled on foot. After defendant's arrest, money from the bank was found in his truck. In addition, two bank employees identified defendant as the robber,[1] and DNA (deoxyribonucleic acid) matching defendant's DNA was found on the black Halloween mask, which had been located along the ORV trail. Defendant represented himself at trial.

On appeal, defendant contends that the trial court was biased against him and tainted the jury, that the traffic stop and his subsequent arrest were illegal, that the identification testimony from the bank employees should have been suppressed, that he was improperly denied additional funding for his expert witness, and that the court should have granted his motion for a new trial. Defendant is representing himself on appeal.

## II. JUDICIAL BIAS

Defendant first contends that the trial judge pierced the veil of judicial impartiality, and denied him a fair and impartial trial, through certain comments the judge made in front of the jury.

## A. LEGAL BACKGROUND

"Whether judicial conduct denied a defendant a fair trial is a question of constitutional law that this Court reviews de novo," and we generally "review the trial court's decision to deny defendant's motion for a mistrial related to this issue for an abuse of discretion." *People v Boshell*, 337 Mich App 322, 345; 975 NW2d 72 (2021) (quotation marks and citation omitted). In *People v Stevens*, 498 Mich 162, 164; 869 NW2d 233 (2015), our Supreme Court set forth "the appropriate standard for determining when a trial judge's conduct in front of a jury has deprived a party of a fair and impartial trial":

> A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial.

Here, defendant cites several comments made by the trial judge that allegedly support defendant's contention that the judge pierced the veil of impartiality. We will discuss these

---

[1] While defendant was fleeing, his mask came off and he turned to look back at the bank with his face exposed. These bank employees testified that they saw defendant's face at this point and recognized him in court.

comments in detail below. In doing so, our analysis is further guided by the following instructions from the *Stevens* Court:

> This inquiry requires a fact-specific analysis. A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality. See, e.g., [*People v Young*, 364 Mich 554, 559; 111 NW2d 870 (1961)] (holding that the judge's colloquy with the defendant's medical expert improperly invaded the province of the jury on the crucial issue which was theirs to decide); *McMillan v Castro*, 405 F3d 405, 410 (CA 6, 2005) (stating that reviewing courts must consider "whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the [judge]'s conduct falls demonstrably outside this range so as to constitute hostility or bias."). Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors. See [*People v Cole*, 349 Mich 175, 199-200; 84 NW2d 711 (1957)] (concluding that certain judicial comments "standing alone" did not constitute error, but "taken together" the errors deprived the defendant of a fair trial).

> These errors must be considered within the context of a given case, i.e., the totality of the circumstances, to determine whether the judge demonstrated the appearance of advocacy or partiality on the whole. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. See *Freudeman v Landing of Canton*, 702 F3d 318, 328 (CA 6, 2012), citing *McMillan*, 405 F3d at 409-410. This list of factors is not intended to be exhaustive. Reviewing courts may consider additional factors if they are relevant to the determination of partiality in a particular case. Moreover, the aggrieved party need not establish that each factor weighs in favor of the conclusion that the judge demonstrated the appearance of partiality for the reviewing court to hold that there is a reasonable likelihood that the judge's conduct improperly influenced the jury. The reviewing court must consider the relevance and weigh the significance of each factor under the totality of the circumstances of the case. [*Stevens*, 498 Mich at 171-172 (second alteration in original).]

Furthermore, the Court in *Stevens* also instructed:

[T]he reviewing court must determine whether the judge's conduct improperly influenced the jury without considering the weight of the evidence presented against the aggrieved party or whether the conduct *actually* contributed to the jury's verdict. Rather, in considering improper influence, the reviewing court must determine whether the judge's conduct was sufficiently severe and clear so as to create the appearance of bias against the aggrieved party. It is the existence of this appearance that is considered improper influence, and the nonexhaustive factors

outlined within this opinion are targeted at determining whether the judge's conduct created an appearance of bias. [*Id*. at 171 n 3.]

## B. ALLEGED IMPARTIAL CONDUCT

Here, defendant cites several specific instances of alleged misconduct by the trial judge. First, defendant claims that the judge "belittled" defendant and defendant's trial strategy, and displayed hostility and irritation in front of the jury, by interrupting defendant's cross-examination of Detective Sergeant Craig Johnson. Specifically, defendant asked Detective Johnson about the bottle of water he provided to defendant and then took away during defendant's police interview, after which defendant asked, "Isn't that a tactic that the police use in collecting someone's DNA? . . . They'll give you something to drink in an interview." The judge stated:

> That's your questions? How about you just—instead of playing around in a circle like you seem to do a lot—ask the detective whether he took your water glass to collect your DNA? How about we assess that and maybe we can save 30 minutes.

Defendant then asked Detective Johnson, "Did you take the water bottle?" Detective Johnson replied, "It went in the garbage. We collected DNA from you at the jail."

Defendant also contends that the trial judge advocated on behalf of Detective Johnson's credibility during the following exchange:

> *The Court*: . . . So, right now we're trying to get at--. You're trying to establish that this detective has lied previously. But this--to this point you have not done that. So you need to tighten up your questions to do that if that's what you are trying to do.
>
> [*Defendant*]: Okay. I don't know what you mean by tighten up?
>
> *The Court*: Because your questions haven't established that he's been deceitful at all to this point.
>
> [*Defendant*]: Well when he testified previously and was asked if he deprived me of food or water at an evidentiary hearing he said no.
>
> *The Court*: And he's saying no again today, so that doesn't prove anything.
>
> [*Defendant*]: Okay, well we have the video that would show if he took it.
>
> *The Court*: The--. Why don't you ask the next question?

Defendant continued his cross-examination, was permitted to play a portion of the video recording of his police interview for the jury, and essentially accused Detective Johnson of obtaining defendant's DNA from the water bottle to plant it on the Halloween mask. Detective Johnson emphatically denied that accusation, and there was no objection by the prosecutor or interruption by the judge to this portion of defendant's cross-examination.

-4-

Next, defendant complains about the following interruption during his cross-examination of Detective Sergeant William Veltman as defendant was questioning him about the discovery of the stolen money during the search of defendant's truck:

*Q*. Okay. And that was the first thing you did when you took the money back to the State Police post?

*A*. It was one of the first things that I did that I recall.

*Q*. What was the first thing that you did?

*A*. I may have used the restroom, I'm not sure.

*Q*. Okay. So there was some time there when you weren't—before you even identified those bills, correct?

*A*. Yeah, there was probably sometime there.

*The Court*: Is there a point to this?

[*Defendant*]: Yeah, I'm trying to separate the time from when they had the money and—

*The Court*: For what purpose? I mean what's the point?

[*Defendant*]: Well the point is the time stamps on the bank bills have—

*The Court*: The time stamps on what?

[*Defendant*]: On the photographs of the bills that we're talking about that was counted and identified—those time stamps are before the time stamps—

*The Court*: Well how about you get to that? I mean if that's your point? I don't know why we have to have a thirty-question lead up to your point.

[*Defendant*]: I'm just trying to—

*The Court*: Okay.

[*Defendant*]: --reiterate.

*The Court*: Well we don't need any reiteration.

[*Defendant*]: Okay.

*The Court*: How about you get to your point?

[*Defendant*]: All right.

Defendant also contends that the trial judge showed irritation with defendant while defendant was questioning DNA analysis expert Ann Hunt about DNA evidence. During his cross-examination of Hunt, defendant asked questions concerning any results from inputting the DNA profile obtained from the Halloween mask into the Combined DNA Index System (CODIS). Hunt explained that "CODIS is a database in which profiles can be compared to reference samples that are in that database." Hunt testified that she did not have any knowledge of any CODIS results in this case, and that she did not believe reports were written for CODIS matches if the sample was already matched to a known sample as had occurred in the present case, where she determined there was a match between the DNA found on the mask and DNA sample collected from defendant.

The following exchange occurred as defendant continued to question Hunt:

[*Defendant*]: Okay. So as far as you know there's been no corroboration of the test results with a CODIS hit coming back from my profile?

[*Prosecutor*]: Your Honor, again he is mischaracterizing the testimony. The testimony is because she because she had a known sample she would not have received a CODIS hit in this case.

*The Court*: Mr. Mier?

[*Defendant*]: (No verbal response)

*The Court*: That's what I heard; did you hear something different?

[*Defendant*]: I don't--. I don't even know if that would answer my question. I'll ask a different question.

*The Court*: Okay.

Defendant asked a few more questions about CODIS protocol before voluntarily concluding his cross-examination. After the prosecutor's redirect, defendant conducted recross-examination, which led to the trial judge's comment of which defendant complains on appeal. The entire exchange was as follows:

*Q*. Just to clarify, you put the profile from the mask in the CODIS, correct?

*A*. Yes, sir.

*Q*. Not the known sample.

*A*. Correct.

*Q*. Okay. So whatever DNA sample was on the mask those result[s] would have come back in CODIS if there was a hit, correct?

[*Prosecutor*]: No, your Honor. That's on [sic] her testimony. She's—

-6-

[*Defendant*]: That's—

[*Prosecutor*]: --already testified that because there was a known sample it would not have expected a CODIS that—

[*Defendant*]: We're not talking about the known sample; we're talking about the evidence--the DNA evidence that was found on the mask, correct? That's—

*The Witness*: I entered the profile from the DNA-from the facemask into CODIS. And that is searched against other evidentiary databases as well as--as well as individual databases.

By [*Defendant*]:

*Q*. Okay. So the known sample has nothing to do with the results coming back from CODIS, correct?

*A*. I--I think--. I mean if there's an evidence sample that matches somebody in the database there is typically a notification if it's an identified profile. If there's already been a confirmation of a individual matching that evidentiary profile a report probably would not go out on that since it's already been matched and confirmed.

*Q*. So you--? Okay. So you put--. So you put it into CODIS—

[*Prosecutor*]: Your Honor, I think this question has been asked and answered.

*The Court*: This question has been answered and it was answered just this last time as clear as it can be answered.

[*Defendant*]: I didn't even finish asking the question.

*The Court*: I know. But your quest--. Well, ask a question because it's 4:00 and you've asked this question four times now.

[*Defendant*]: I didn't finish the question.

[*Prosecutor*]: Your Honor—

*The Court*: What's the question?

[*Defendant*]: I'll stop asking the ques--. I'll just--. I have no further questions.

*The Court*: I know what you are trying to do and it's not working—

[*Defendant*]:[2] What am I trying to do?

*The Court*: That's why you want to keep asking.

[*Defendant*]: What am I trying to do?

*The Court*: I know what you are trying to do and when the jury is out of presence I'll let you know.

[*Defendant*]: A little prejudicial, your Honor.  I object to that.

*The Court*: Good.  It's on the record.  Any other questions?

[*Prosecutor*]: I have no further questions, your Honor.

At this point, the proceedings ended for the day.  When the trial resumed the following day, defendant moved for a mistrial outside the presence of the jury.  The colloquy between defendant and the trial judge was as follows:

[*Defendant*]: Okay, and one other thing.  I had made an objection about what you said in front of the jury when I was re-crossing the State's expert.  I think it was Ann Hunt, the DNA expert.  So my recollection is you said "I know what you are doing, Mr. Mier."  And to me that was insinuating to the jury that I was being somehow deceitful or dishonest and I feel like it may have tainted the jury and their perception of what was going on.  And for that reason, again, I have to move for a mistrial.

*The Court*: All right, your motion is denied.  An objection was made by the prosecution for your continued asking of the same question over and over again.  After the objection you started--.  What prompted [the prosecutor] to object was you started the same question again with regard to the DNA that the State and Federal governments collect.  That's what prompted her objection.  The witness had already--had just finished answering that question and it was my notion--based on what I had heard to this point—that you were trying to again ask the same question with regard to why it didn't come up to your previous DNA.  And that had already been effectively dealt with on at least four to five previous questions and answers, which is why I stopped you.

[*Defendant*]: Oh, okay.  I just--.  What did you mean by you knew--you knew what I was trying to do?

*The Court*: Just what I just said.  I know that you were trying to attack this witnesses' credibility in the finding of DNA because there wasn't a hit on your

---

[2] The transcript attributes this question to the judge, but it is apparent from the context that defendant asked this question.

previously filed DNA.  I know that's what the objective of your question was and that's why I said what I said.

[*Defendant*]: And again, I just have to make a record.

*The Court*: The record is made.

[*Defendant*]: Well I'd--I would like to make another argument regarding my right to confrontation.  And—

*The Court*: Right to confrontation on what?

[*Defendant*]: Challenging somebody's credibility.

*The Court*: And you challenged it.  You don't get to ask the same questions over and over again all day long in an effort to challenge someone's credibility.

[*Defendant*]: Well, I was interrupted in the middle of the question.

*The Court*: I asked if you had any other questions and you said no.

[*Defendant*]: Well I ended up giving up because I just felt—

*The Court*: Well that's your decision.  I didn't stop you.

[*Defendant*]: Well I didn't want to—

*The Court*: I stopped you asking the same question over and over again, which I have the right to do.  But I didn't stop your other questions of this witness and I in fact, on the record, asked "Do you have any other questions?" and you said no.

[*Defendant*]: Right.

*The Court*: That's your choice.

[*Defendant*]: Okay.  And just finally I would ask for some sort of instruction to the jury to ignore what you had said.

*The Court*: I have an instruction that has been read to the jury and it will be read again as the composite instructions at the end that my opinions don't count.  So they have already heard that and it will be asked--it will be told to them again.  Okay, you can bring the jury in.

Next, defendant complains about statements made by the trial judge during the jury selection process.  The following occurred during jury voir dire:

[*Defendant*]: Okay.  It's a touchy subject 'cause we're talking about kids; right?  Now, technically what I'm being charged with those children are victims.

* * *

[*Defendant*]: Okay? Right? I've been charged with the threat - - a false report of a threat of an act of terrorism. What that means is a population of people were threatened or coerced—

*The Court*: Mr. Mier, I'm gonna stop you right there.

Ladies and gentlemen, I will instruct you on the law. Mr. Mier has an opinion on the law, and he has a defense that he wants to present, but I will instruct you on the law. Okay?

So, Mr. Mier, thank you.

[*Defendant*]: And he's -- he's right. He's right. . . .

Defendant argues on appeal that the above statement by the trial judge was "belittling." Additionally, defendant complains about the trial judge's response after defendant asked the jury venire, "Is there anyone that does not want to be here?" Defendant also stated, "I don't want any of you here if you don't want to be here" and engaged in a dialogue about this topic with a specific juror. Eventually, the judge stated:

All right. Let me -- let me -- Mr. Mier, if I may jump in.

I understand that sentiment, but -- this is to everybody on the panel -- you understand as a citizen of this county and of the state and of this country that we have certain duties, and this is one of them. And so you may not want to be here, but do you understand that duty?

* * *

And you understand that as a citizen [] you need to fulfill the duty?

* * *

Is everyone okay with that?

The potential jurors responded affirmatively.

Defendant also asserts that the judge coerced the jury into reaching a "hasty" verdict. The jury was given the final instructions and began its deliberations late in the afternoon on a Friday. As the jury was about to begin deliberations, the trial judge informed the jury as follows:

The other point about this, it's 3:30 -- going on 3:30, I plan to close at 4:30, which is the closing time. If deliberations are not over yet -- I hate to say this -but we will be back Monday at 9:00 to continue. If that should occur, while you're at home on your own, you are not to think or discuss the case with anyone. And, obviously, to not contact any of your fellow jurors to continue deliberation on your

own. You won't start deliberation again until, if necessary, that Monday morning at 9:00 when you are all here as a whole.

The jury reached its verdict by 4:05 p.m. that day.

## C. NATURE OF JUDICIAL CONDUCT

In analyzing defendant's claims of judicial partiality, we first consider the nature of the judge's conduct. *Stevens*, 498 Mich at 164. Our Supreme Court has observed that "[j]udicial misconduct may come in myriad forms," which may include "belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions" such as "[p]ert remarks and quips from the bench [that] have no place in the trial of a criminal case." *Id*. at 172-173 (quotation marks and citation omitted).

Here, defendant cites the various statements by the trial judge that we have quoted above as evidence that the judge was impartial and committed misconduct by belittling defendant in front of the jury, showing hostility and irritation toward defendant in front of the jury, advocating on behalf of the prosecution's witnesses, implying to the jury that defendant was somehow dishonest, and coercing the jury. With respect to the judge's conduct during cross-examination, it is evident from considering the judge's statements in their full context, rather than out of context as defendant has described them, that each cited instance represented attempts by the trial court to prevent needless repetition in defendant's cross-examinations and to keep the questioning focused on relevant issues and the issues that defendant was apparently intending to explore to the extent such issues were relevant and permissible.

At the time of defendant's trial, MRE 611(a)[3] stated:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

Moreover,

> A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but the judge should bear in mind that undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on the judge's part toward

---

[3] The Michigan Rules of Evidence were amended on September 20, 2023, effective January 1, 2024. See Administrative Order No. 2021-10, 512 Mich lxiii (2023). This opinion relies on the version of MRE 611 that was in effect at the time this matter was decided by the trial court. The amendment of the rules did not change the substance of this rule.

> witnesses . . . may tend to prevent the proper presentation of the cause, or the ascertainment of truth in respect thereto . . . . In addressing counsel, litigants, or witnesses, the judge should avoid a controversial manner or tone. A judge should avoid interruptions of counsel in their arguments except to clarify their positions, and should not be tempted to the unnecessary display of learning or a premature judgment. [*Stevens*, 498 Mich at 174, quoting Code of Judicial Conduct, Canon 3(A)(8) (ellipses in original).[4]]

Although a few statements by the trial judge in the instant case could have been left unsaid, it is abundantly clear from the transcript that the trial judge generally allowed defendant to conduct his cross-examinations as he wished while still exercising the court's authority to control the trial and avoid unnecessary waste of time. In doing so, the trial court merely redirected defendant so that defendant could still get to the point of his questioning without extraneous detours and repetition.

With respect to defendant's complaints about the judge's conduct during voir dire, it is indisputably the sole duty and responsibility of the judge to instruct the jury on the law. See *People v Duncan*, 462 Mich 47, 53; 610 NW2d 551 (2000) ("The court must inform the jury of the law by which its verdict must be controlled."); *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1998) ("It is the province of the jury to determine questions of fact and assess the credibility of witnesses."); *Warwick v Elsey*, 47 Mich 10, 16; 10 NW 57 (1881) ("[I]n the determination of questions of law and fact the judge and jury are respectively independent and neither is allowed to invade the province of the other."). Here, by clarifying for the jury the principle that the judge would be the source of instruction on the law, the judge did no more than instruct the jury on this point of law, consistent with the judge's responsibility for effectively managing the trial. *Duncan*, 462 Mich at 53; *Stevens*, 498 Mich at 174; see also MCR 2.513(B) ("The trial court must control the proceedings during trial, limit the evidence and arguments to relevant and proper matters, and take appropriate steps to ensure that the jurors will not be exposed to information or influences that might affect their ability to render an impartial verdict on the evidence presented in court.").

Next, with respect to the judge's comments to the jury venire that jury duty is a duty to fulfill even if a person does not want to fulfill it, the judge again merely provided a true statement of law. We note that "[f]ailing to attend court, without being excused, at the time specified in the notice, or from day to day, when summoned as a juror" is punishable as contempt of court. MCL 600.1346(e). Moreover,

> [a] juror called and accepted for service acts as an essential part of the judicial system of the State. The service is one that may be required on the theory that it is the duty of every qualified citizen to render it when called to do so. The status of the juror is analogous in certain respects to that of one who is drafted under law into the military service of government. Under our system of selecting jurors the relationship between the county and the individual juror does not rest on contract, express or implied, but, rather, is founded on requirements of statute law. One who

---

[4] This provision is currently contained in Canon 3(A)(12).

-12-

is summoned for such duty has no option other than to comply with the mandate served on him. His duties are prescribed by the law of the State, and he is not subject to direction by the county. [*Jochen v Saginaw Co*, 363 Mich 648, 664; 110 NW2d 780 (1961).]

We next consider defendant's argument that the trial judge coerced the jury into reaching a hasty verdict by informing the jury that court would be adjourned for the weekend in approximately an hour, with deliberations to continue if necessary on Monday. The relevant question when considering whether a trial judge improperly coerced a jury to reach a verdict is "whether the instruction given [could] cause a juror to abandon his [or her] conscientious dissent and defer to the majority solely for the sake of reaching agreement[.]" *People v Walker*, 504 Mich 267, 278; 934 NW2d 727 (2019) (quotation marks and citation omitted; alterations in original). Here, there is nothing in the statement of which defendant complains that would have caused a juror to abandon his or her view in deference to the majority for purposes of reaching a verdict; there was "no pressure, threats, embarrassing assertions, or other wording that would cause this Court to feel that it constituted coercion . . . ." *People v Hardin*, 421 Mich 296, 315; 365 NW2d 101 (1984) (quotation marks and citation omitted). The judge merely provided the jury with information about the schedule so jurors would know what to expect, while simultaneously indicating that the jury would have the time it needed to deliberate.

Based on our review of the record as discussed above, the nature of the judge's conduct does not favor a conclusion that the veil of impartiality was pierced.

### D. TONE AND DEMEANOR

The tone and demeanor of the trial court present us with matters not obviously apparent from the transcript. While it may, at times, appear from the record that the judge was somewhat exasperated with defendant's manner of trying his case, it is evident that overall, the trial judge was patient with allowing defendant to fully defend his case as he wished, within lawful bounds, and that the trial judge also attempted to redirect defendant when he became lost in the weeds so as to allow defendant to pursue the line of questioning he seemingly intended. Thus, this factor also does not favor a conclusion that the veil of judicial impartiality was pierced.

### E. REMAINING FACTORS

With respect to the scope of the judicial conduct, it is evident that the need for the judge to intervene was overwhelmingly due to defendant's overly repetitious style of cross-examination and defendant's relative lack of skill in acting as an attorney. To the extent the judge's intervention was directed more at defendant than the prosecution, this intervention was for the same reasons. Finally, the trial court gave a curative instruction instructing the jury during final instructions in relevant part as follows:

It is my duty to instruct you on the law. You must take the law as I give it to you. If the prosecutor or defendant says something different about the law, follow what I say. At various times, I have already given you some instructions about the law. You must take all my instructions together as the law you are to follow. You should not pay attention to some instructions and ignore others.

To sum up, it is your job to decide what the facts of this case are, to apply the law as I give it to you, and, in that way, to decide the case.

* * *

My comments, rulings, questions, and instructions are also not evidence. It is my duty to see that the trial is conducted according to the law, and to tell you the law that applies to this case. However, when I make a comment or give an instruction, I am not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion. You are only -- you are the only judges of the facts, and you should decide this case from the evidence.

* * *

Now there were several objections during this trial, and I ruled on those objections. My rulings are not evidence. And any opinions you take from me as to my rulings, that' s not evidence either. Also, any comment I may have made during this trial, either to Ms. Schultz or Mr. Mier, that's not evidence either.

None of these remaining factors favor a finding that the veil of judicial impartiality was pierced. Accordingly, evaluating defendant's challenged judicial conduct under the totality of the circumstances, we conclude that defendant has not shown that the veil of judicial impartiality was pierced in this case because it is not reasonably likely that the judge's conduct created the appearance of advocacy or partiality against defendant. *Stevens*, 498 Mich at 164.[5]

## III. MOTION TO SUPPRESS

Defendant contends that he was subject to an illegal stop and an illegal arrest and that the trial court should have granted his motion to suppress evidence flowing from the arrest.

This Court "review[s] a lower court's factual findings in a suppression hearing for clear error. However, because the application of constitutional standards presents a question of law, a lower court's ultimate ruling at a suppression hearing is reviewed de novo." *People v Pagano*, 507 Mich 26, 31; 967 NW2d 590 (2021) (citation omitted).

Defendant first argues that law enforcement officers did not have the necessary reasonable and articulable suspicion to instigate the traffic stop of his vehicle.

The United States Constitution and the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures. US Const, Am IV; Const 1963,

---

[5] Defendant points to additional alleged instances of judicial impropriety in his reply brief. But reply briefs "must be confined to rebuttal, and a party may not raise new or *additional* arguments in its reply brief." *Lawrence v Mich Unemployment Ins Agency*, 320 Mich App 422, 443-444; 906 NW2d 482 (2017) (quotation marks and citation omitted; emphasis added).

art 1, § 11. "Even a brief traffic stop constitutes a seizure of a vehicle's occupants," but " 'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' " *Pagano*, 507 Mich at 32, quoting *Terry v Ohio*, 392 US 1, 22; 88 S Ct 1868; 20 L Ed 2d 889 (1968). The *Pagano* Court stated:

> A brief, on-the-scene detention of an individual is not a violation of the Fourth Amendment as long as the officer can articulate a reasonable suspicion for the detention. Colloquially, a brief detention of this sort is referred to as a *Terry* stop. Whether an officer has reasonable and articulable suspicion to briefly detain an individual is a fact-specific inquiry that is determined on a case-by-case basis. A determination regarding whether a reasonable suspicion exists must be based on commonsense judgments and inferences about human behavior. Although reasonable and articulable suspicion is a lesser showing than probable cause, it still entails something more than an inchoate or unparticularized suspicion or hunch, because an officer must have had a particularized and objective basis for the suspicion of criminal activity. [*Id.* (quotation marks and citations omitted).]

At the suppression hearing, Detective Johnson testified that he issued a "be on the lookout" (BOL) for the black truck, with a photograph of it. He provided detailed testimony about the evidence he had possessed when he issued the BOL that led him to suspect that the truck was involved in the bank robbery. Detective Johnson said that he learned that witness Katie Killackey had noticed the truck parked in a strange area of the cemetery at 8:50 a.m., with nobody around. The robbery was reported at approximately 9:15 or 9:20 a.m., and officers responded to the area. When the cemetery was investigated at 9:30 a.m., the truck was gone and acceleration marks were found on the ground where the truck had been parked. Surveillance video from a business near the bank showed the same truck in the area about 45 minutes before the robbery occurred.

Additionally, bank employees and other witnesses from another nearby business saw the robber leave the bank and proceed toward the ORV trail and toward the cemetery, which was about 1200 feet from the bank. The black truck had been parked at the cemetery by the ORV trail. Detective Johnson stated that the truck was "in the cemetery parking lot 1200 feet from the bank 20 minutes before the bank robbery and was gone 10 minutes after the bank robbery," and "the suspect fled on foot in that direction from the bank[.]" After the BOL was issued, officers received information that the truck belonged to defendant.

Sergeant Dale Zaherniak, of the Arenac County Sheriff's Department, testified at the suppression hearing that he received the BOL, which he passed on to his deputies in the area. Arenac County Sheriff's Deputy Jeremy Switek informed Sergeant Zaherniak that he recognized the vehicle and that it belonged to defendant. Deputy Switek recognized the truck from his previous interactions with defendant. On the morning of the robbery, after Deputy Switek received the BOL, he saw defendant's truck and began to follow him. Deputy Switek testified that he saw defendant driving the truck and that he did not see anybody else in the truck. He called for backup in order to conduct a felony traffic stop based on defendant's suspected involvement in the bank robbery.

Sergeant Zaherniak was one of the officers who arrived to assist with the traffic stop. Defendant stopped at a stop sign, and Deputy Switek turned on his lights to initiate a traffic stop. Defendant attempted to accelerate and drive away, and Sergeant Zaherniak drove his patrol vehicle directly into the rear end of defendant's truck, causing it to spin into the ditch. This tactic was referred to as a "PIT maneuver." Defendant got out of his truck and ran into the cornfield.

The trial court found that there was reasonable suspicion justifying the traffic stop under the totality of the circumstances. Based on the above describe evidence from the hearing, it was reasonable for the officers to infer that the bank robber had fled from the bank, along the ORV trail, to the truck parked in the cemetery, and driven away in the truck, providing a "particularized and objective basis" to suspect that the driver of the truck was involved in the bank robbery. *Pagano*, 507 Mich at 32 (quotation marks and citation omitted). We note that a "police officer's reasonable suspicion may be based on information obtained from another." *People v Chambers*, 195 Mich App 118, 122; 489 NW2d 168 (1992). The trial court did not err in concluding that there was reasonable and articulable suspicion of criminal activity to support the traffic stop. *Pagano*, 507 Mich at 31-32.

Defendant next contends that he was seized without probable cause before he could be given a chance to submit to the investigative stop. But this is contradicted by the police officers' testimony. Sergeant Zaherniak testified that the police officers, in three separate cars (two of which were fully marked police cars), waited until defendant was stopped at a stop sign to try to effectuate a traffic stop by blocking the truck in. They did not know whether defendant was armed. Overhead lights were activated. The sergeant testified that the truck then "accelerated at a high rate of speed" while turning to the right and contacted the undersheriff's patrol car. The sergeant then used a "PIT maneuver" to cause the truck to spin and come to a stop. Defendant fled into a cornfield.

Defendant could have remained stopped at the stop sign but did not. Instead, he accelerated, which rendered the use of the PIT maneuver reasonable. See *Graham v Connor*, 490 US 386, 397; 109 S Ct 1865; 104 L Ed 2d 443 (1989) ("As in other Fourth Amendment contexts, . . . the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). Indeed, the officers here possessed reasonable suspicion that the driver of the truck had committed an armed robbery, and he did not obey an attempt to stop him. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 US at 396-397. As previously explained, the initial seizure was justified by reasonable suspicion supporting a *Terry* stop. Defendant had the opportunity to comply with that stop but instead attempted to drive away.

Defendant also appears to argue that law enforcement officers were prohibited from transporting him from Arenac County, where he was apprehended, to Ogemaw County to interrogate him about the bank robbery because arresting someone for investigative purposes is illegal.

As defendant observes, our Supreme Court held in *People v Bloyd*, 416 Mich 538, 540; 331 NW2d 447 (1982), that "a person may not be seized, detained, and questioned, and then transported in a police car from one place to another in the absence of probable cause to arrest" under the circumstances present in that case. In *Bloyd*, a police officer saw defendant drive out of the supply yard of a business at 4:50 a.m. while the business was closed. *Id*. at 540-541. The officer stopped defendant, even though there was no evidence "that the defendant had committed a traffic offense, that the property was posted against trespassing, that the property was enclosed by a fence, or that there had been any reports of criminal activity in the area." *Id*. at 541. After driving the defendant to two different business locations in a patrol car, officers discovered that there had been a break-in and charged the defendant with breaking and entering. *Id*. at 541-543.

The Michigan Supreme Court held in *Bloyd* that the defendant's state and federal constitutional rights to be free from unreasonable seizures were violated. *Id*. at 555. The Court noted the general rule that "that an official seizure of the person must be supported by probable cause, even if no formal arrest is made." *Id*. at 548 (quotation marks and citation omitted). Reasoning that the officers "had no knowledge of any crime" and "only an assumed 'reasonable suspicion' during the time of detention at issue," the Court concluded that the "defendant was transported from one place to another in search of a crime, detained for custodial interrogation, and subjected to more than a brief stop for on-the-scene questioning and investigation without probable cause for arrest" even though "the detention was 'in important respects indistinguishable from a traditional arrest.' " *Id*. at 547-548 (citation omitted).

In the present case, however, defendant was arrested for bank robbery. Although police continued their investigation after arresting defendant in this case, defendant was not arrested for investigative purposes. Detective Veltman and Detective Johnson testified at the suppression hearing that defendant was arrested on the scene for bank robbery that occurred in Ogemaw County.

"The lawfulness of a search or seizure depends on its reasonableness," and a "custodial arrest based on probable cause is not an unreasonable intrusion under the Fourth Amendment." *People v Nguyen*, 305 Mich App 740, 751; 854 NW2d 223 (2014) (quotation marks and citation omitted). The *Nguyen* Court stated:

> In reviewing a claim that the police lacked probable cause to arrest, this Court must determine whether facts available . . . at the moment of arrest would justify a fair-minded person of average intelligence in believing that the suspected person had committed a felony. Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of criminal activity. Circumstantial evidence, coupled with those inferences arising therefrom, is sufficient to establish probable cause . . . ." [*Id*. at 751-752 (quotation marks and citations omitted; ellipses in original).]

Here, the same factual circumstances that provided reasonable suspicion, which we have already discussed in detail, were also sufficient to justify a fair-minded person of average intelligence in believing that defendant, as the occupant of the truck seen in the area to which the robber was seen fleeing after the robbery and who was also known by law enforcement to drive such a truck, had committed the bank robbery. *Id*. Law enforcement possessed information

-17-

showing much more than "a probability or substantial chance of criminal activity." *Id*. (quotation marks and citation omitted). Accordingly, the officers had probable cause to arrest defendant for bank robbery and defendant has not established any violation of the rule stated in *Bloyd*.

Because defendant has not shown that he was subjected to an illegal *Terry* stop or an illegal arrest, his argument that evidence flowing from that alleged illegality should have been suppressed is without merit. The trial court did not err by denying defendant's motion to suppress. *Pagano*, 507 Mich at 31.

## IV. IN-COURT IDENTIFICATIONS

Defendant next contends that the trial court should have excluded the in-court identifications by witnesses Kayla Raushi and Heather Spies, who were both working at the bank at the time of the robbery. Raushi testified on day two of trial, and Spies testified on day three. Defendant did not to object to the in-court identification of either witness at the time each identification was made.

Instead, on the fifth day of trial, defendant complained that the two witnesses had identified him in court even though, according to defendant, the police reports did not state that any witnesses could identify him. Defendant argued that this constituted an attempt to have "some sort of surprise" at trial. On appeal, defendant now argues that the in-court identifications should have been excluded because they were unreliable, unnecessarily suggestive, and not supported by an independent basis.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal," unless the ground is apparent from context. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001); MRE 103(a). The objection must be timely. MRE 103(a). "For an objection to be timely it must be contemporaneous with the error to provide the trial court an opportunity to correct the error, which could thereby obviate the necessity of further legal proceedings and would be by far the best time to address a defendant's constitutional and nonconstitutional rights." *People v Butsinas*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 364778); slip op at 11. "An objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground." *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993).

Defendant did not timely raise the ground on which his appellate argument for exclusion is based and therefore has failed to preserve this issue for appeal. Moreover, contrary to defendant's assertion, defendant did not preserve this issue by raising it at his postjudgment motion for a new trial. *Butsinas*, ___ Mich App at ___; slip op at 10 ("We hold that a party asserting evidentiary error who fails to object at a time that gives the trial court the opportunity to correct the error does not preserve that evidentiary error by raising it for the first time in a postjudgment motion for a new trial.").

We review unpreserved issues for plain error affecting substantial rights, which requires a defendant to show that there was error, that was plain, and that affected the outcome of the lower court proceedings. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

"The procedure used to obtain identification evidence of a witness is an important consideration under the both the state and federal Constitutions' protections of defendants' rights to due process of law." *People v Posey*, 512 Mich 317, 331; 1 NW3d 101 (2023) (opinion by BOLDEN, J.), citing US Const Am XIV; Const 1963, art 1, § 17; accord *Posey*, 512 Mich at 361 (CAVANAGH, J., concurring in part and concurring in the judgment); *Posey*, 512 Mich at 390 (WELCH, J., concurring in part, dissenting in part, and concurring in the judgment). "A defendant's due-process rights protect against the admissibility of in-court identification evidence that was preceded by a pretrial identification procedure that was so unnecessarily suggestive as to be conducive to mistaken identity." *Posey*, 512 Mich at 332 (opinion by BOLDEN, J.) (quotation marks and citation omitted); *id*. at 361 (CAVANAGH, J., concurring in part and concurring in the judgment); *id*. at 390 (WELCH, J., concurring in part, dissenting in part, and concurring in the judgment). A majority of the Court in *Posey* further held that "evidence of an unnecessary first-time-in-court identification procured by the prosecution—a state actor—implicates a defendant's due-process rights in the same manner as an in-court identification that is tainted by an unduly suggestive out-of-court identification procedure employed by the police." *Id*. at 339 (opinion by BOLDEN, J.); *id*. at 361 (CAVANAGH, J., concurring in part and concurring in the judgment); *id*. at 390 (WELCH, J., concurring in part, dissenting in part, and concurring in the judgment).

A majority of the *Posey* Court also agreed that "it is never *necessary* for a prosecutor to ask a witness to identify a defendant *for the first time* at trial" because the "state can always employ a nonsuggestive identification procedure before trial or elicit other incriminating testimony as to the circumstances of the crime without asking the witness to identify the defendant in the courtroom." *Id*. at 338 n 6 (opinion by BOLDEN, J.); *id*. at 361, 367 (CAVANAGH, J., concurring in part and concurring in the judgment); *id*. at 390 (WELCH, J., concurring in part, dissenting in part, and concurring in the judgment).

Nonetheless, even assuming without deciding that defendant in this case has demonstrated plain error in the admission of the in-court identifications at trial, he has still not shown that he is entitled to appellate relief because he has not established the requisite prejudice. On plain-error review, it is defendant's burden to show "that the error affected the outcome of the lower court proceedings" in order to establish the necessary prejudice. *Carines*, 460 Mich at 763.

Here, both bank employees identified defendant as the robber at trial. However, even without this identification evidence, there was overwhelming circumstantial evidence demonstrating that defendant was the person who robbed the bank. The bank robber was seen by multiple witnesses leaving the bank and going toward an ORV trail leading to the cemetery where a black truck had been parked before the robbery occurred. After the robbery, the truck was gone from the cemetery and there was evidence that defendant was known to drive a truck like the one that had been seen at the cemetery that morning. Defendant was subsequently apprehended after he was seen getting out of the same truck and in that truck was found cash containing bills with serial numbers that had been recorded by the bank. Defendant's DNA was also found on the mask worn by the bank robber that was recovered from the ORV trail. In light of this overwhelming evidence tying defendant the bank robbery, he has not shown that he was prejudiced by the in-court identifications even if they were plainly erroneous. *Id*.

## V. EXPERT WITNESS FUNDING

Next, defendant argues that he was denied due process because the trial court failed to award funds to his expert for trial preparation. However, as defendant acknowledges, the trial court did approve funding for defendant's expert. Defendant merely complains that additional funding should have been authorized, but he does not indicate with any degree of specificity how his defense strategy would have differed if his expert had appeared at trial or how further assistance from his expert would have altered the outcome of the trial. See *People v Kennedy*, 502 Mich 206, 227-228; 917 NW2d 355 (2018) (holding that a defendant must demonstrate a reasonable probability that an expert would be helpful to the defense and that denial of the assistance would result in a fundamentally unfair trial; defense counsel must familiarize himself or herself with the area in question and provide the court with as much information as possible). The *Kennedy* Court stated that a "defendant's bare assertion that an expert would be beneficial cannot, without more, entitle him or her to an expert . . . ." *Id*. at 226. Defendant here has merely offered conclusory assertions that additional expert funds should have been authorized and thus has not shown that his due-process rights were violated.

## VI.  MOTION FOR NEW TRIAL

Defendant argues that the trial court should have granted his motion for a new trial based on many of the arguments we have already discussed in this opinion. A grant or denial of a motion for a new trial is reviewed for an abuse of discretion. *People v Harris*, 190 Mich App 652, 658-659; 476 NW2d 767 (1991). "An abuse of discretion occurs when the circuit court chooses an outcome that falls outside the range of principled outcomes." *People v Jones*, 497 Mich 155, 161; 860 NW2d 112 (2014). "On the defendant's motion, the court may order a new trial on any ground that would support appellate reversal of the conviction or because it believes that the verdict has resulted in a miscarriage of justice." MCR 6.431(B); accord *People v Rogers*, 335 Mich App 172, 192; 966 NW2d 181 (2020).

Here, defendant merely repeats arguments that he has already made and does not advance any new ones. Having demonstrated no error requiring reversal on any of the above grounds, defendant also has not shown that the trial court abused its discretion by denying his motion for a new trial.

Affirmed.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ Christopher M. Trebilcock